# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHERMAN STREET ASSOCIATES, LLC          :
and MICHAEL KNIGHT,                      :
      Plaintiffs,                         :     3:03-cv-1875 (CFD)
                             :
              v.                         :
                             :
JTH TAX, INC. ET AL.,                    :
      Defendants.                         :

## MEMORANDUM OF DECISION

## I.    Introduction

The plaintiffs, Michael Knight and Sherman Street Associates, LLC (generally referred to collectively as "Sherman Street") brought this action against defendant JTH Tax, Inc., d/b/a Liberty Tax Service ("Liberty").  Liberty is a franchisor licensing and supervising franchises which prepare personal income tax returns.  It is incorporated in Delaware and maintains its principal place of business in Virginia Beach, Virginia.  Sherman Street is a Connecticut corporation that entered into franchise agreements with Liberty.  Sherman Street opened four Liberty franchises in Connecticut for one tax season, but Liberty terminated the franchise agreements on September 30, 2003.  Sherman Street alleges the termination violated the Connecticut Franchise Act ("CFA"), Conn. Gen. Stat. § 42-133f, and also that Liberty tortiously interfered with Sherman's Street prospective sale of one its franchises.  After this Court's ruling on the parties' cross-motions for summary judgment, Sherman Street's two counts that remain are a claim for breach of the CFA and a claim for tortious interference of a business expectancy governed by Virginia law.  Liberty has filed counterclaims for breach of the franchise agreements, breach of a promissory note, and breach of guaranty, also governed by Virginia law.

After consideration of the testimony and exhibits presented at trial, the parties' proposed findings of facts, and closing arguments by counsel, the Court makes the following findings of fact and conclusions of law.

## II.    Findings of Fact

1. Michael Knight is a resident of the state of Connecticut. Knight has been a certified public accountant since 1976. Knight operates a certified public accounting practice known as "Michael J. Knight and Company, CPAs." Knight's accounting practice provides "higher end full year" tax-related services to "sophisticated" clients with complicated returns, and also provides other services such as estate planning. Knight is also the sole member of Sherman Street Associates, a Connecticut limited liability corporation.[1]

2. In 2002, Knight became interested in expanding into the retail federal earned income tax credit return field. An earned income tax credit return is usually prepared for taxpayers who are entitled to a tax refund based on their low income. In June 2002, Knight attended a presentation for prospective franchisees by Liberty[2] in New York City, and decided to purchase ten Liberty franchises.

3. Knight attended a week-long Liberty-sponsored Effective Operations Training in Virginia Beach, Virginia in July 2002. During the training, Liberty's Chief Executive Officer,

---

[1] It appears that Knight incorporated Sherman Street Associates for the purposes of owning and managing his Liberty Franchises. Under the franchise agreements with Liberty, he is jointly and severally liable for Sherman Street's obligations. See Conclusions of Law # 11.

[2] The complaint was originally brought against both JTH Tax, Inc. and Liberty Tax Service, Inc. There is not corporate entity known as "Liberty Tax Service, Inc.," but JTH Tax, Inc. does business as "Liberty Tax Service." The parties agree that the proper defendant in this case is JTH Tax, Inc. d/b/a Liberty Tax Service.

John Hewitt, recommended Ryan Sheppard to Knight to manage his Liberty franchises. That summer, Knight hired Sheppard to manage the day-to-day operations of the franchises.

4. From September 10, 2002 to September 30, 2002, Knight entered into ten franchise agreements with Liberty. The purchase price for these franchises was $20,000 each, resulting in a total price of $200,000. The agreements also provided for additional royalty payments to be paid to Liberty, as described below. These franchise agreements gave Knight the right to operate ten Liberty franchises within specified areas in Connecticut. As payment for these franchises, Knight paid Liberty $56,000 in cash, and executed a promissory note for the remaining $144,000 on September 30, 2002.

5. The ten franchises were:

    CT004  – New Haven
    CT003  – West Haven
    CT013  – Bridgeport
    CT008  – Norwalk
    CT010  – Stamford
    CT030  – Waterbury
    CT031  – Waterbury
    CT032  – Milford
    CT018  – Westport
    CT012[3] – Trumbull

6. Pursuant to the schedule in the franchise agreements, Knight was to open four offices in 2003, two more in 2004, two more in 2005, and the final two in 2006.

7. After entering into the franchise agreements, Knight and Sheppard began selecting locations for the first four offices. Maps of the boundaries of each territory were attached to each franchise agreement. Sherman Street signed leases at 571 Campbell Avenue for the West Haven

---

[3] The "CT" numbers reflect the Liberty assigned number designations for each territory.

location, and at 4348 North Main Street for the Bridgeport location. Sherman Street also signed two other leases for 170 Post Road in Fairfield, Connecticut and 144 Amity Road in New Haven, Connecticut.

8. There were several disputes between Sherman Street and Liberty in the early months of the relationship. First, Liberty operates an internet portal for its franchisees known as "ZeeNet." ZeeNet allows Liberty franchisees to electronically receive Liberty's confidential operations manual, various forms, Liberty's marketing information, and links to vendors. Unbeknownst to Liberty, Sherman Street had hired a marketing consultant, Brian Brady, and Sheppard provided Brady with his confidential ZeeNet password. When Liberty learned this on December 17, 2002, it disabled Sherman Street's ZeeNet account to prevent any unauthorized access. Sherman Street's access to ZeeNet was restored by December 23, 2002. Second, there was a dispute about Sherman Street's ability to process tax refund checks for its customers. Sheppard wished to have a processing computer at each franchise location, which would allow Sherman Street to provide its customers with tax refund checks shortly after their returns were processed. Liberty wanted Sherman Street to utilize just one processing computer for its four locations, and have couriers deliver the checks to each of the other locations. Third, there was a dispute about the location of two of Sherman Street's offices. On December 17, 2002, Liberty Regional Director Sue Wickham sent a letter to Knight stating it had come to her attention that two of Sherman Street's offices were outside of its approved territories. Sherman Street later learned the problem was with the 170 Post Road Fairfield location and the 144 Amity Road New Haven location.

9. Liberty sent its Chief Operating Officer, Michael Trainor, to Connecticut to meet with

Knight and Sheppard to discuss these and other issues.  The three met at the Fairfield Diner in Fairfield, Connecticut on December 23, 2003.  As a result of the meeting, several changes were made to Sherman Street's franchises.  Liberty allowed Knight to "swap out" two of his territories for new territories, which would encompass the mis-located offices at 170 Post Road in Fairfield, and at 144 Amity Road in New Haven.  Liberty and Knight also agreed to reduce the number of Knight's territories from ten to five, reducing Knight's debt on his note to Liberty by $100,000.  Also, if Knight met certain performance parameters, Liberty would allow Knight to repurchase the five additional franchises for the same price he had originally paid.  Knight also agreed to sign a set of "special stipulations" as part of this new arrangement, promising, among other things, to adopt Liberty's recommended marketing practices, to utilize only two processing centers instead of four, and not provide the ZeeNet password to any third parties.

10.   After the meeting, Trainor sent Knight an email on December 27, 2002 summarizing their discussions.  He asked Knight to select the territories he wished to keep, and the territories he wanted to return to Liberty.  Trainor also sent a list of proposed "stipulations" to be part of the franchise agreements.

11.   On January 3, 2003, Sheppard completed a chart indicating which of the ten original territories Sherman Street wished to keep, swap, and sell back.  On January 6, 2003, Knight signed a "Mutual Termination Agreement" returning five of his franchises to Liberty.  In exchange, Liberty agreed to reduce the amount Knight owed on his promissory note from $144,000 to $44,000.  New franchise agreements were signed on January 21, 2003 for Territory CT011–Fairfield (encompassing the 170 Post Road location) and Territory CT083–Seymour (encompassing the 144 Amity Road, New Haven location) replacing the unopened Westport and

Trumbull territories. A new note in the amount of $44,000 was also executed by Sherman Street, and the original note for $144,000 was canceled. After these documents were executed, Knight owned the following five territories:

CT004 – New Haven
CT003 – West Haven
CT013 – Bridgeport
CT011 – Fairfield
CT083 – Seymour (located in New Haven)

All of the franchise agreements contained personal guarantees by Michael Knight of those agreements as well as other "debts due to [Liberty]," which included the new note. The original franchisee for all five agreements was Michael Knight. He subsequently assigned some of the franchises to Sherman Street, but represented in the assignments that he remained as a personal guarantor.

12. Shortly after executing the mutual termination agreement and special stipulations, Sherman Street expressed concern to Trainor that there were two different versions of the royalty provisions for the five franchise agreements. Specifically, version "6-02" required first-year franchisees to pay a flat royalty of $5,000 per territory, regardless of the number of tax returns that franchise prepared that year. Version "7-01" reflected an incentive structure, which required first-year franchisees to pay a royalty of $7,500 per franchise, minus $30.00 for each return prepared after a threshold of 500 returns had been prepared, with a minimum royalty of $4,500. If less than 500 returns were prepared, each franchise would be responsible for $7,500 in royalties. Sherman Street's franchise agreements for the West Haven, Fairfield and Seymour territories were version 6-02, reflecting a flat $5,000 royalty structure, while the franchise agreements for the New Haven and Bridgeport territories were version 7-01, reflecting the

$4,500/\$7,500 royalty structure.

13.  Michael Trainor informed Knight that he could choose which royalty structure he preferred for all five franchises.  Knight informed Trainor that he selected the $4,500/\$7,500 royalty structure to apply to all his franchises, and Trainor sent Knight a revision of the special stipulations that reflected this choice.  On January 21, 2003, Knight signed a final version of the special stipulations reflecting this royalty structure.[4]

14.  Sherman Street opened four franchises in January 2003 in the West Haven, Bridgeport, Fairfield and Seymour (New Haven) locations.  The New Haven location never opened.[5]

15.  Throughout the 2003 tax season (January through April), there were disputes between Sherman Street and Liberty regarding funds Sherman Street owed Liberty.  Liberty

_____

[4] There are two versions of the special stipulations, also titled "Schedule 'C' to the Franchise Agreements," admitted into evidence.  Both are signed by Michael Knight and John Hewitt, President and CEO of Liberty, and dated January 21, 2003.  One version contains 10 paragraphs, and the other contains 11 paragraphs.  Paragraph 11 on the second version details the $4,500/\$7,500 royalty structure to which Knight agreed.  It appears this 11-paragraph version is meant to modify the franchise agreements for the West Haven, Fairfield and Seymour territories, since those are the franchise agreements that originally contained the flat $5,000 royalty structure, while the 10-paragraph version applies to the franchise agreements for the New Haven and Bridgeport territories, which already contained the $4,500/\$7,500 royalty structure.  Despite these duplicate versions of the special stipulations, the evidence clearly establishes that after January 2003, Sherman Street knew it owed royalties under the $4,500/\$7,500 arrangement.  First, Trainor sent a letter to Knight on January 14, 2003 attaching a revised version of the special stipulations "to reflect the royalty structure that you have selected."  Second, on March 10, 2003, Sue Wickham sent an email to Ryan Sheppard incorrectly stating that Sherman Street's franchises agreed to the $5,000 royalty structure.  Then Ryan Sheppard replied very shortly thereafter, correcting her and stating that Knight had chosen the $4,500/\$7,5000 option.  This exchange makes clear that Sheppard and Knight were clear about the royalty structure that applied to Sherman Street's franchises.  See also n.6, below.

[5] Because the New Haven franchise did not open, Sherman Street was not responsible for royalties for that location.

collected some of the payments it was owed from Sherman Street through a process known as "fee intercepts." Customers who came to Liberty franchises to have their tax returns prepared had the option of receiving their tax refund in the form of an electronic refund check or a "refund anticipation loan." With these options, the customer received an advance on their tax refund, and did not have to pay the tax preparation fees to the franchise directly. Instead, those fees were deducted from the customer's refund advance. When the return was processed by the Internal Revenue Service, the franchise received its preparation fee. If a franchise was on the fee intercept program, the Liberty system directed the fees be directly routed into Liberty's account, instead of into the franchisee's account. Liberty applied those funds to the obligations of the franchisee.

16. However, if the funds Liberty collected through the fee intercept program were not sufficient to extinguish a franchisee's obligations, the franchisee owed Liberty the balance.

17. Liberty initially billed each of the four Sherman Street franchises $5,000 for minimum royalty payments. Two franchises were billed on February 5, 2003 and two were billed on February 12, 2003. These initial February billings reflected the incorrect royalty structure. At the time, Liberty's accounting system had not yet been updated to reflect the $4,500/$7,500 royalty structure Knight chose as part of the special stipulations he signed in January.

18. On May 1, 2003, Liberty billed each of the four Sherman Street franchises $2,500 for the additional royalties owed. Because no Sherman Street franchise had completed more than 500 returns that season, each franchise owed the higher $7,500 amount in royalties. The bill for $2,500 per franchise reflected the difference between what each franchise (correctly)

owed—$7,500—and what it had already (incorrectly) been billed—$5,000. Thus, the final amounts were correct.

19. In addition to the royalties Sherman Street owed Liberty, Sherman Street's account receivable balance also included several miscellaneous charges, which were appropriate under the franchise agreements, such as a charge for a Yellow Pages ad that was billed in December 2002.

20. In addition to the account receivable balance Sherman Street owed, Sherman Street was also liable on its promissory note. The face amount of the promissory note, $44,000, was due on April 1, 2003, along with an interest amount set forth in the note. The franchise agreements provided that failure to pay obligations such as the note was cause for termination of the franchises.

21. Sherman Street received email updates from Liberty about the amounts that were being intercepted through the fee intercept program, and how much was being applied against its accounts receivable and promissory note. Liberty would generate such an email each time it did a fee intercept. These emails also included a section which listed the amounts currently due on the promissory note and accounts receivable. Each email concluded with the following statement: "If you experience cash flow difficulties as a result of these withholdings, please contact your Regional Director."

22. In addition to these emails, Liberty also sent out "Honor Roll" deficiency notices to Sherman Street each month beginning in March. These notes state that Sherman Street had not been included on the Liberty "honor roll" of franchises because of failure to pay royalties to Liberty.

23.  Beginning in April 2003, Sherman Street also received letters from Liberty entitled "Notice to Cure."  The first, sent on April 7, 2003, states:

> This letter is to serve notice that you are in violation of your promissory agreement in that you owe us monies which are more than 30 days past due.  Monies owed include but are not limited to royalty payments.  The amount owed to date is $17,917.00.  Please remit this amount immediately . . .
>
> Failure to pay amounts owing pursuant to your franchise agreement is a violation of that agreement.  Such a violation could result in the termination of your franchise agreement in addition to other remedies available to us.  This notice in no way waives the remedies available to us at this time or in the future.

The amount owed on the promissory note was not included because it was not yet 30 days past due on April 7, 2003.

24.  On April 23, 2003, Sherman Street received another Notice to Cure letter.  This letter stated that the amount due was $61,746, reflecting the amount owed on the promissory note and the royalties.  Even though Sherman Street's promissory note was only 23 days past due on April 23, not 30 days past due, Liberty's accounting system showed the note due as of April 23.

25.  On May 19, 2003, Liberty Regional Director Lynn Owen spoke with Knight, and agreed to extend the due date on the promissory note until March of 2004, but conditioned on Sherman Street's paying the past due royalties within the next 30 days.  Knight failed to pay the royalties within 30 days.  On June 30, 2003, Sheppard sent an email to Owen stating, "Mike [Knight] asked me to let you know the bank is a little behind but the financing is coming soon." The terms of the note were not changed, so it remained past due as of April 30, 2003.[6]

---

[6] In April and May 2003, Sheppard indicated to Lynn Owen that he was still confused about the amount of royalties that were due because Liberty had sent previous invoices with the incorrect royalty structure.  On June 2, 2003, Owen sent Sheppard a clarifying email which set forth the correct royalty structure of $7,500 per franchise.  Since none of the franchises had prepared over 500 returns, at least from June 2 it was very clear to Sherman Street that the

26.  On July 25, 2003, Sheppard sent an email to Lynn Owen stating that he had spoken

with Knight, and "unfortunately we just don't have the funds at this time.  A sale of one or

possibly two of our territories will be of use regarding this situation."  Owen took some notes on

a printed copy of the email, with some ideas about how to handle the situation.  One idea she

noted was to defer all the receivables for royalties that Sherman Street owed that year by issuing

a second promissory note that would be due the following year.  Owen had discussed the idea

with Mike Trainor, and he initially was receptive to that proposal.  However, that "idea" was

never consummated in revised agreements with Sherman Street or Knight, or the issuance of a

new note for the royalties.

27.  On August 27 and 28, Lynn Owen received emails instructing her to look into

terminating Sherman Street's franchises.  On August 27, Trainor had received an email reporting

that a "prospective franchisee" had said Ryan Sheppard was "pretty negative" about Liberty.[7]

Trainor then sent an email on August 27 to other executives at Liberty which said,

> This kind of negative feedback from someone who owes us 28,000 and is asking us to
> extend credit for another season is UNACCEPTABLE.  Look into the possibility of
> sending Michael Knight a termination notice today based on his failure to pay his AR
> [account receivable] balance!  Tell me what we can do after the RD meeting.

The next day, on August 28, Lynn Owen wrote to Sally Coon, Liberty's Vice President for

_____

amount of royalties due was $30,000 (4 times $7,500) minus the fee intercepts but adding
qualifying expenses.

[7] Liberty also had other concerns about Ryan Sheppard.  Sheppard was unable to attend a
full-length "Effective Operations Training" at the times they were offered, so Liberty made an
accommodation for him to attend an abbreviated course at Liberty's headquarters in Virginia
Beach, Virginia.  Liberty was also concerned by Sheppard and Knight's approach to marketing
their franchises, which deviated from Liberty's prescribed "guerrilla marketing" strategy.
Trainor had visited the Liberty franchises in early 2003 and was dissatisfied with their operations
and marketing.

Operations, and said she would send out a Notice to Cure for Sherman Street's past due accounts receivable. She noted "this will back up the termination notice if we choose to go this route with him." She also said she would not send out a new promissory note for the past due accounts receivable.

28. On August 28, 2003, Sherman Street received a final Notice to Cure letter. This letter stated that the amount due was $28,125.52. The amount due decreased form $61,746 on April 23 to $28,125.52 on August 28 because the August 28 amount does not reflect the amount also owed on the promissory note. As previously mentioned, Liberty had agreed to postpone the balance due on the note if all the receivables were paid. Interest had accrued on the accounts receivable amount due, which is the reason the August 28 Notice to Cure reflected an amount higher than the April 7 Notice to Cure.

29. Sherman Street never made any payments based on this or any other Notice to Cure. In fact, except for the funds that were withheld from Sherman Street's account pursuant to the fee intercept program, Sherman Street never made any payment to Liberty on either its accounts receivable or its promissory note.

30. The total royalties due from Sherman Street to Liberty were $30,000. ($7,500 for each of four open franchises.)[8] The total amount due from Sherman Street to Liberty for advertising and supplies during the tax season Sherman Street operated its franchises was $6,922.30. Liberty recovered $10,455.08 of these amounts due through fee intercepts. Therefore, the entire amount of accounts receivable unpaid by Sherman Street was $26,467.22.

_____

[8] Sherman Street never opened a location in its New Haven territory, CT004. The royalty structures applied to franchises during their first year of operation.

The entire principal amount of the promissory note, $44,000, remained unpaid.

31. On September 30, 2003, Liberty sent Sherman Street a letter terminating the franchise agreements. The letter stated "[t]his termination is based upon your failure to pay amounts owed to us" and was "effective immediately." As of September 30, 2003, Sherman Street's franchises were again cut off from ZeeNet, and its passwords to process returns were disabled.

32. During the summer of 2003, a small business owner named Lai Sun had expressed interest in purchasing some Liberty franchises. Initially, he had wanted to buy the Bridgeport location, but because it was not available he purchased a Norwalk territory. After Sherman Street was terminated, Liberty tentatively agreed to allow Knight to sell the Bridgeport location to Lai Sun. Sun and Knight began discussing an arrangement in which Sun would purchase the location directly from Sherman Street for $47,000. According to Sherman Street's franchise agreement with Liberty, Section 4(h), if Knight wished to transfer the franchise to another franchisee, he had to pay Liberty a transfer fee of $2,500. The sale between Knight and Sun did not occur and Liberty did not receive the transfer fee.

33. Ultimately, Liberty sold the Bridgeport franchise to Lai Sun directly in early 2004 for $25,000.

III. **Conclusions of Law**

Connecticut Franchise Act

1. The Connecticut Franchise Act ("CFA") provides in pertinent part that a franchisor shall not terminate a franchise "except for good cause, which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable

obligation of the franchise agreement." Conn. Gen. Stat. § 42-133f(a).

2. The trial court must apply an "objective standard" when determining whether or not the franchisor had good cause. Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc., 736 A.2d 824, 839 (Conn. 1999). The franchisor bears the burden of proving "good cause." Id.

3. The Court finds that Sherman Street's failure to pay the receivables (including the royalties and expenses) and the note it owed constitutes a material breach of the agreement, and good cause for termination. Section 4 of each franchise agreement (and special stipulation Paragraph 11) required Sherman Street to pay royalties to Liberty. The evidence is clear that Sherman Street never made a payment to Liberty from the time Knight signed the franchise agreements in September 2002 until the time Sherman Street was terminated in 2003.[9] Whatever confusion Sherman Street may have had about the precise amounts owed, or whatever discrepancies may have appeared in Liberty's billing, did not excuse Sherman Street from its obligations to pay. See E.Z. Save, Inc. v. Getty Petroleum Corp., 46 F. App'x 55, 56 (2d Cir. 2002) (interpreting the CFA and holding that "we agree with the district court that [the plaintiff's] non-payments breached the agreements and that [the defendant] had good cause for termination"). Even in the time period from May through July 2003 when Liberty indicated it would consider extending the due date of the original note and perhaps agreeing to a second note for the receivables, no payments were made on the receivables and note, and Sherman Street indicated to Liberty it did not have funds to make payments on the overdue receivables and overdue note.

_____

[9] Liberty did collect approximately $10,000 from Sherman Street through the fee intercept program, but no other payments were received on either the receivables or note.

4. Sherman Street argued that Liberty lacked good cause because Mike Trainor's decision to terminate Sherman Street was based merely on a rumor that Ryan Sheppard had made negative comments about Liberty to another franchise "prospect." This argument fails. First, Trainor's email stated that he wanted to look into terminating Knight "based on his failure to pay his AR balance." The evidence shows Sherman Street's outstanding debts to Liberty were part of Trainor's decision. Second, "the standard for evaluating the reasons advanced [for termination] is not subjective, but objective, not what the franchisor sincerely believes justifies termination but what is 'reasonable from the perspective of the disinterested observer.'" Hartford Elec. Supply Co. v. Allen Bradley Co., Inc., No. CV 96562061S, 1997 WL 297256, at * 11 (Conn. Super. Ct. May 28, 1997) (citing Darling v. Mobil Oil Corp., 864 F.2d 981, 989 (2d Cir. 1989)). Therefore, regardless of whether Liberty executives were in part motivated to terminate Sherman Street because of Ryan Sheppard's negative comments, or because of Sherman Street's failure to make payments, the Court's task is to decide whether Liberty's stated reasons objectively satisfy the "good cause" standard. As discussed above, under Connecticut law, Sherman Street's failure to make its payments to Liberty constitutes good cause for termination.

5. Sherman Street also argues that even if Liberty had good cause to terminate it, the termination was procedurally defective in violation of the CFA. The CFA provides that "the franchisor shall give the franchisee written notice of such termination . . . at least sixty days in advance to such termination." Conn. Gen. Stat. § 42-133f(a). Liberty sent Sherman Street Notices to Cure on April 7, 2003, April 23, 2003 and August 28, 2003.[10] The Notices stated that

---

[10] Liberty also sent a letter titled "Notice to Cure" to Sherman Street on July 11, 2003, however that letter did not state that Sherman Street may be terminated for failure to pay amounts past due. Instead, the letter stated that Liberty had not received Sherman Street's profit and loss

Sherman Street was "in violation of your promissory agreement in that you owe us monies which are more than 30 days past due."[11]  The Notices to Cure also said, "Failure to pay amounts owing pursuant to your franchise agreement is a violation of that agreement.  Such a violation could result in the termination of your franchise agreement in addition to other remedies available to us."  On September 30, 2003, Liberty sent Sherman Street a letter notifying it of the termination of its franchise agreements "effective immediately."

The Court finds that neither the Notices to Cure nor the September 30 termination letter satisfy the CFA's sixty day notice requirement.  The CFA requires written notice of termination sixty days before such termination.  Liberty terminated Sherman Street "effective immediately," and cut off Sherman Street's access to ZeeNet and tax return processing.  The Notice to Cure letters did not provide notice of termination, but merely provided notice of possible termination in the event that Sherman Street failed to pay its past due amounts.

Termination notices that have been upheld by Connecticut courts as complying with the sixty day notice requirement of the CFA state unequivocally that the franchisee will be terminated, and then state a day (more than 60 days in the future) when that termination will become effective.  See, e.g., Hartford Elec. Supply Co., 736 A.2d at 830 (upholding as a proper

---

statement for the fiscal year, and that Sherman Street "must submit these reports immediately." The letter did not mention any possible termination.

[11] The April 7 Notice claimed the amount due and owing more than 30 days was $17,917, which reflected the balance on Sherman Street's accounts receivable, but not the promissory note.  The April 23 Notice claimed the amount due and owing more than 30 days was $61,746, which reflected both the accounts receivable amount and the promissory note.  The August 28 Notice claimed the amount due and owing more than 30 days was $28,125.52, which reflected the accounts receivable balance and interest, but not the promissory note.  See Findings of Fact # 23, 24, and 28.

termination a letter dated June 27, 1996 informing the plaintiff that the defendant intended to terminate the agreement as of September 30, 1996); Getty Petroleum Marketing, Inc. v. Tuli, No. CV 2110191, 200 WL 893447, at * 3 (Conn. Super. Ct. June 21, 2000) ("At the conclusion of the August 3 letter, the termination date of October 8, 1999 is set out in bold-faced type with instructions on vacating the premises. Because the termination date was notice greater than sixty days, this court finds such notice to be sufficient under the General Franchise Act."). Because Liberty notified Sherman Street that its franchise agreements were terminated on September 30, 2003, to comply with the CFA the termination should have become effective sixty days after September 30. Instead, Liberty stated that the termination was "effective immediately," and cut off Sherman Street's access to ZeeNet and its processing passwords.

6. As remedy for Liberty's violation of the CFA, Sherman Street is entitled only to recover lost profits for the sixty days the termination was in effect without the requisite notice. See McKeown Distribs., Inc. v. Gyp-Crete Corp., 618 F. Supp. 632, 643 (D. Conn. 1985) (holding that a violation of the advance notice provision of the CFA "at most would entitle [the plaintiff] to recover lost profits for the . . . [sixty] additional days it would have been in operation prior to the date that termination would be permitted under the . . . Act"); Peterit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186–87 (2d Cir. 1995) (stating "plaintiffs not given the requisite 60-days notice are entitled to damages for lost profits during the time the . . . [termination] was in effect without the requisite notice").

Sherman Street has failed to show it would have made any profit during October and November 2003, the period it would have still been in operation prior to a valid termination notice. First, the tax season runs from January until April. Few if any customers would have

visited Sherman Street's franchises in October and November. Second, Sherman Street's profit and loss statement for fiscal year 2002–2003 showed a net loss of $181,334. Therefore, Sherman Street is not entitled to any damages for Liberty's violation of the Connecticut Franchise Act for failure to provide adequate notice. The Court finds for the plaintiff on Count One of the Amended Complaint, but does not award any damages.[12]

Tortious Interference with a Business Expectancy

7. To recover on a claim for tortious interference under Virginia law, the plaintiff must prove: (1) the existence of a business relationship or expectancy, with a probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) reasonable certainty that absent the defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damages. Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 228 (4th Cir. 2004) (citing Commercial Bus. Sys., Inc. v. Halifax Corp., 484 S.E.2d 892, 896 (Va. 1997).

8. Under Virginia law, a party cannot tortiously interfere with a business relationship to which it is a party. McDonald's Corp. v. Turner-James, No. 05-804, 2005 U.S. Dist. LEXIS 42755, at *14 (E.D. Va. Nov. 29, 2005). Because Liberty would have been a party to the contract assigning Sherman Street's Bridgeport franchise to Lai Sun, as a matter of law it cannot have tortiously interfered with the transaction. In the McDonald's case, a McDonald's franchisee

_____

[12] Plaintiffs also contend that the franchise agreements were unlawfully terminated by Liberty in late 2002 by Liberty's conduct concerning the ZeeNet, the failure to provide an adequate number of "processing centers," and related activity. Plaintiffs also contend that these actions compelled them to relinquish the five franchises in January 2003. The Court concludes that this activity by Liberty did not constitute breach of the franchise agreements, violations of the Act, or unlawful duress or compulsion which resulted in the January modifications.

wished to sell her franchise to a buyer, but the sale was ultimately unsuccessful. After the franchisee was terminated, the franchisee brought a counterclaim against McDonald's for tortious interference in the prospective sale. The district court, interpreting Virginia law, held that because McDonald's was a "party to the franchise agreement and must consent to its assignment," it cannot be a "stranger" to that agreement, and the claim should be dismissed on that basis. Id.; see also Childers Oil Co., Inc. v. Exxon Corp., 960 F.2d 1265, 1271 (4th Cir. 1992). The Court finds for the defendant on Count Three of the Amended Complaint.

Liberty's Counterclaims for Breach of the Franchise Agreements, Breach of the 2003 Promissory Note, and Breach of Personal Guaranty

9. To state a claim for breach of contract under Virginia law, a plaintiff—or counterclaimant—must allege facts to demonstrate: (1) a legally enforceable obligation of the defendant to the plaintiff; (2) defendant's breach of that obligation; and (3) damage to the plaintiff as a result of the breach. Vianix Delaware v. Nuance Communications, 637 F. Supp. 2d 356, 359 (E.D. Va. 2009) (citing Filak v. George, 267 Va. 612, 619 (2004)).

10. As discussed above, Sherman Street's failure to make any payments to Liberty for its past due accounts receivable amounts is a breach of the franchise agreements. In addition, it is undisputed that Sherman Street and Knight never made any payment toward the outstanding debt on the $44,000 promissory note signed January 21, 2003. Even if at times there was some confusion on the exact amount of Sherman Street's delinquent accounts receivable, there was also good cause for termination based on failure to pay the note, and that amount was always clear. There also was no agreement reached to modify the $44,000 note. As to the receivables, no payment was ever made, the amounts due were clearly indicated to Sherman Street at least by

June 2003, and Sherman Street indicated in the summer of 2003 that it did not have funds to pay them. The Court finds that Sherman Street breached both the franchise agreements (and attached special stipulations) as well as the promissory note.

11. Section 21 of the franchise agreements provides that "the signatures of the individual(s) below also constitute their personal joint and several . . . obligation to make payments specified herein, [and] pay any other debts due to us." Michael Knight signed each of the franchise agreements and special stipulations. Therefore, the Court finds he is jointly and severally liable for Sherman Street's outstanding obligations.

12. "The remedy for breach of contract is intended to put the injured party in the same position in which it would have been had the contract been performed." Marefield Meadows, Inc. v. Lorenz, 427 S.E.2d 363, 366 (Va. 1993). Therefore, as a remedy for Sherman Street's breach of the franchise agreement and promissory note, Liberty is owed the amount of accounts receivable unpaid by Knight and the amount of the promissory note plus interest.

13. The Court finds for the defendant Liberty on Counts Two, Three and Four of its Amended Counterclaim. Liberty is entitled to damages of $26,467.22 for accounts receivable unpaid by Sherman Street and $44,000 for the unpaid promissory note, which totals $70,467.22, plus interest.

## IV.    Conclusion

In conclusion, for the reasons stated above, the Court finds for the plaintiff on its claim that Liberty violated the Connecticut Franchise Act. Although Liberty had good cause to terminate Sherman Street, its termination notice did not comply with the Act's sixty-day notice provision. However, Sherman Street failed to prove any damages as a result of the improper

termination. The Court finds Liberty did not tortiously interfere with Sherman Street's potential sale of the Bridgeport franchise. The Court also finds that Sherman Street breached the franchise agreements, and the promissory note, and that Michael Knight is jointly and severally liable. Liberty is entitled to $70,467.22, plus interest.

Liberty may file a claim for prejudgment interest and attorney's fees within two weeks of the date of this Ruling. Opposition may be filed within one week after the date such a claim is filed.

SO ORDERED this 30th day of August 2011, at Hartford, Connecticut.


/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**